Filed 2/10/15  In re William H. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re WILLIAM H. et al., Persons Coming Under the Juvenile Court Law. | |
| MENDOCINO COUNTY HEALTH & HUMAN SERVICES, CHILDREN AND FAMILY SYSTEM OF CARE, <br><br>        Plaintiff and Respondent, <br><br> v. <br><br> PAUL H., <br><br>        Defendant and Appellant. | A142255 <br><br> (Mendocino County Super. Ct. Nos. SC-UK-JV-SQ-14-1695901-001, SC-UK-JV-SQ-14-1696001-001) |

Appellant Paul H. (father) contests a juvenile court order establishing dependency jurisdiction over his sons, William (born 2004) and Michael (born 2007). (Welf. & Inst. Code, § 300, subds. (a), (b), (c).)[1] The children's mother does not appeal. Father contends he was denied due process when the court allowed amendment of the petition to add an allegation of physical abuse (§ 300, subd. (a)) and that the allegation was sustained without sufficient evidence to support it. We shall affirm the order.

**Facts and Procedural History**

The parents were never married but lived together for many years. They separated sometime around 2011 and father was awarded sole physical custody of William and

___

[1] All further section references are to this code except as noted.

1

Michael.[2] The parents continue to occupy the same rural property, which mother owns. Mother lives in the house and father lives with the children in a mobile home located about 50 to 75 yards from the house. The Mendocino County Health and Human Services, Children and Family System of Care (the county) has received numerous reports of neglect by both parents throughout the children's lifetimes. Most pertinent here are incidents occurring in 2013 and 2014.

In September 2013, the police located "a large marijuana garden" in front of father's residence. Father was inside the mobile home and a man father later identified as his "partner" and "guard dog" was in the garden with a loaded handgun and "metal knuckles" is his pants pockets. The partner's girlfriend was also in the garden. She was found holding a glass methamphetamine pipe in her hand and admitted to recent consumption. The garden contained 31 mature marijuana plants. Father told police the plants would yield between 93 and 124 pounds of marijuana. Father had a physician's medical marijuana recommendation but it was expired. Also, the quantity of marijuana exceeded medical marijuana limits. The police confiscated and destroyed the illegal marijuana.

The county investigated the family in November 2013 when the children came to their psychological therapy sessions unwashed and wearing dirty clothes. A county social worker, Timothy Turner, interviewed the children on November 14, 2013. Michael reported that mother had, that week, kicked him in his "privates" and slapped and punched William in the face "10 times." William said mother "went psycho" but the child "shut down" when asked for details. William said "Dad's been really acting crazy lately. If it was just beer, that's one thing . . . [but] he's smoking that white powder. . . . Dad gets crazy when he smokes that stuff."

William said father once chased Michael around the yard with a running chain saw. Michael was "screaming and crying for help." The blade came within four inches of

---

[2] The parents have two other children: a minor daughter who lives with relatives and an adult son. Mother has another adult son from a previous relationship. Our discussion here is limited to William and Michael (collectively, the children).

the boy's back. William reported separate incidents in which father kicked Michael in the crotch and spanked Michael on "his bare bottom, until Michael had red marks on his behind and could not sit down." When interviewed separately, Michael confirmed that his father kicked him and chased him with a chain saw. Michael also showed Turner a circular scar on his back, which he said was from father burning him on the back with a cigarette "a long time ago." Turner observed that the burn scar "appeared to be from straight on contact and not a glancing burn from a child accidentally brushing against a parent's cigarette." Both children reported strange men often "coming and going" at home, even when his father was not there. William said he makes his own meals ("sandwiches and stuff" in the microwave) and does his homework on his own. William told Turner: "I'm glad you are here. I want someone to help my family."

Turner and police officers went to the children's home following the interviews. Father was not home when they arrived but "at least three other adult males [were] present in the trailer home," including a man who had been accused of indecent exposure "in the presence of a mother and her baby." Father returned home during the inspection. Father said the man accused of indecent exposure was a new acquaintance and denied any knowledge of his past. Turner cautioned father not to allow the man to be alone with the children and father called the man over and told him to leave. Father said mother is "bi-polar, schizophrenic, and [a] methamphetamine user." He said the mother was recently "5150'd" (detained for psychological observation) and had been living with a boyfriend who beat her and William. Father said the judge who awarded him physical custody of the children "instructed that the boys not be allowed to go to their mother's home as long as she was unstable and she allowed [her abusive boyfriend] to live with her."

Father denied using methamphetamine. Father smokes cigarettes and marijuana but denied burning Michael with a cigarette. Father denied kicking Michael but admitted chasing him with a chainsaw, which father dismissed as "playing" with the child. Father insisted that he and a live-in girlfriend care for the children's needs. Turner decided to monitor the situation rather than remove the children from home at that time.

Turner interviewed the children several days later, on November 18, 2013. The man suspected of indecent exposure was still coming to the residence, according to William. William said father was angry with the children for speaking to a social worker. Turner went to see father at home on November 21, 2013, to ask him to take a drug test. Father said he had to go to work but would submit to testing later in the day. Father did not do as promised. Turner renewed his request for drug testing several days later, and father submitted. He tested negative for all substances. The county closed the case but warned father that more referrals could lead to court intervention. Father declined the county's offer of voluntary services.

The county received additional referrals in January 2014. The children were at mother's home when she broke a window "during an angry outburst"; glass almost fell on Williams, who was playing outside. In a separate incident, the police were called to mother's house when she refused to return Michael to father after a visit. The mother "wav[ed] a large knife or sword over her head." Another referral was received when Michael reported that his nine-year-old cousin hit him in the crouch and the cousin also dropped his pants and told Michael to touch the cousin's penis. The incident occurred at the cousin's home, when the cousin's mother was babysitting the children. The cousin's mother has a history with social services.

In February 2014, Turner told father "the sheer number of referrals called into the [child protective services] hotline was creating concerns in the community regarding the safety of the children" and that father had to do a better job supervising the children. Father agreed to keep the children safe and signed a "Family Safety Plan." The plan provided father "will not allow his sons to go to their mother's home unsupervised"; "will not allow people, who are strangers to the children, to reside or visit his home while the boys are present"; "will not take [the children] to go to the home of [their cousin] because the boys are not being supervised properly"; and "will contact Medi-Cal [to] complete steps to have the boys' Medi-Cal renewed so they can continue therapy."

The county received another referral in March 2014 when Michael came to school wearing clothes smelling of cigarettes and cat urine and complaining of hunger. Turner

4

interviewed the boys. Michael said he was "hungry a lot." Michael said father "sometimes brings home takeout" but does not consistently provide dinner. Michael said the boys provide for themselves in the morning; they wake to an alarm, dress themselves, and walk to the school bus. William said the children go to their mother's house "all the time" and were never told by father not to go. William also said the children recently spent an entire weekend at his cousin's house. Turner investigated if father renewed Medi-Cal coverage and found that he had not, jeopardizing the boys' continued access to therapy.

The county detained the children in protective custody and, on March 7, 2014, filed a juvenile dependency petition (§ 300). The petition alleged the children suffered, or were at substantial risk of suffering, serious physical harm as a result of the parents' failure to protect the children, averring that mother has "chronic mental health illness that severely impairs her ability to provide care" and father permits the children to "spend time unsupervised at their mother's residence even though they are unsafe in her care," permits the children "to be around transients and strangers that he allows to stay in his home," uses "inappropriate caregivers," and does not provide adequate food and clothing. (§ 300, subd. (b).) The petition further alleged the children are suffering serious emotional damage (they exhibit symptoms of post-traumatic stress disorder) (§ 300, subd. (c)), and that mother is incapacitated by mental illness and unable to provide for the children's support (§ 300, subd. (g)).

A contested jurisdictional hearing was held over the course of two days in April 2014. Evidence was presented in the form of extensive county reports, letters from a therapist who confirmed the children's post-traumatic stress diagnoses, and the testimony of father, social worker Turner and William's school teacher. Father acknowledged that mother's behavior can be "bizarre" and "erratic" but insisted he did not allow the children unsupervised visits with her after he signed the county safety plan, despite William's statement to the contrary. Father testified that only "close friends and family" stayed at his home, and none presented a danger to his children. He denied failing to provide meals

and clean clothes for his children and said that any animal odor on the children was from sleeping with the family dog.

A county report filed with the court related the children's statements to Turner that father chased Michael with a chain saw, burned the boy with a cigarette, and spanked him on "his bare bottom, until Michael had red marks on his behind and could not sit down." On direct examination, Father's attorney asked father if the statements were true. Father said he never burned Michael, not even accidentally, and never spanked his children. Father admitted "teasing" Michael with a chainsaw when the boy was about five years old. Father testified: "I recall revving it up one time and teasing him a little bit like I was going to get them and it scared him a bit." Father said he "was hoping [Michael] was going to grow out of being scared of the loud sound." On cross-examination, the children's counsel asked father if it was "cruel" to chase a young child with a chain saw, especially one with posttraumatic stress disorder. Father said it would be "scary for a kid" but disagreed with the therapist's diagnosis, saying it was "the first [time] I've heard her make that statement."

At the close of evidence, children's counsel asked to amend the petition to conform to proof by adding allegations the children have suffered, or are at substantial risk of suffering, serious physical harm inflicted nonaccidentally (§ 300, subd. (a)) and that the children were subjected to an act of cruelty (§ 300, subd. (i)). (Code of Civ. Proc., §§ 469-470.) County counsel joined in the request. Father's attorney argued there was an insufficient factual basis for allegations of physical abuse or cruelty, noting father's denials and questioning the reliability of young children's recollections.

The court stated: "The matter having been submitted, the court finds true by a preponderance of the evidence added allegation [section 300, subdivision] (a), that the children have suffered or are at substantial risk of suffering serious physical harm, [inflicted] non-accidentally on them by their parents." The court also found true the previously pled allegations that the parents failed to protect their children (§ 300, subd. (b)), the children are suffering serious emotional damage (§ 300, subd. (c)), and that mother is incapacitated by mental illness and unable to provide for the children's support

6

(§ 300, subd. (g)). The court found that the last allegation concerning mother's mental illness, however, did not provide a reason to assert jurisdiction over the children as father is the custodial parent. The court found insufficient evidence to support the newly requested allegation of child cruelty (§ 300, subd. (i)). The court asserted jurisdiction over the children under section 300, subdivisions (a), (b), and (c) and scheduled a dispositional hearing.

The dispositional hearing was held on May 27, 2014. The children were declared dependents of the juvenile court and family reunification services ordered. The children were placed with their paternal grandmother. Father timely filed a notice of appeal from both the jurisdictional and dispositional orders but the only issues raised on appeal concern jurisdiction.

## Discussion

Father contends he was denied due process when the court allowed amendment of the petition at the jurisdictional hearing to add an allegation of physical abuse (§ 300, subd. (a)) and that the allegation was sustained without sufficient evidence to support it.

The county argues we need not address these issues because dependency jurisdiction is founded on several statutory grounds (§ 300, subds. (a), (b), (g)), only one of which father contests (§ 300, subd. (a)). "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) Father acknowledges this principle but asks us to exercise our discretion to address the court's jurisdictional finding of physical abuse because that finding can impact the dependency proceedings. "[W]e generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding (1) that serves as the basis for dispositional orders that are also challenged on appeal [citation]; [or] (2) could be prejudicial to the appellant or could

potentially impact the current or future dependency proceedings." (*In re Drake W.* (2012) 211 Cal.App.4th 754, 762.) A finding of physical abuse may have implications in this dependency proceeding in the selection of appropriate reunification services, conditions of visitation and an evaluation of whether the children can be safely returned to father. Thus, we will review father's appeal on the merits.

Rules governing the amendment of pleadings in civil actions apply "to the same extent and to the same effect" to the amendment of pleadings in juvenile dependency proceedings. (§ 348.) A court may, "in furtherance of justice, and on any terms as may be proper, allow a party to amend any pleading . . . ." (Code Civ. Proc., § 473, subd. (a)(1).) Amendment is proper if the variance between the pleading and proof is not material (Code Civ. Proc., § 470) and no variance is material "unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits." (Code Civ. Proc., § 469.)

"[T]he ability to amend according to proof plays an important role in the overall dependency scheme," where dependency petitions are often drafted hastily upon imperfect knowledge. (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1041.) Courts " 'apply a policy of great liberality in permitting amendments . . . at any stage of the proceedings' " provided " 'no prejudice is shown to the adverse party.' " (*Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 761.)

As an initial matter, we note that father never objected to amendment of the petition. His attorney argued only that there was an insufficient factual basis for the new allegation of physical abuse, not that the amendment was a material variance from the original pleading. "[A] parent's failure to object or raise certain issues in the juvenile court prevents the parent from presenting the issue to the appellate court." (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338.)

In any event, amendment was proper. While physical abuse was not alleged as a basis for jurisdiction in the original petition, detailed accounts of physical abuse were set out in a county report submitted in support of the petition. The report related the children's statements that father chased Michael with a chain saw, burned the boy with a

cigarette, kicked him, and excessively spanked him. Father testified about the incidents. Father's counsel introduced the issue on direct examination by asking father if the statements were true and the children's counsel asked additional questions. Where, as here, "the issues raised by the proposed amendment were in fact fully tried and the evidence is already before the court, it is difficult for the opposing party to claim prejudice." (Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2014) ¶ 12:394, p. 12-87, and cases cited therein.) No prejudice appears here, where father had notice of the facts underlying the amendment in advance of the hearing and examination of those facts was conducted at the hearing. The juvenile court did not abuse its discretion in permitting amendment of the petition.

Father next contends the juvenile court sustained the allegation of physical abuse upon insufficient evidence. The court found that the children suffered, or were at substantial risk of suffering, serious physical harm inflicted nonaccidentally by father because father kicked, burned, and excessively spanked Michael. Those factual findings are well-supported by the evidence.

County social worker Turner reported interviews with the children in which William said father kicked Michael in the crotch and spanked Michael on "his bare bottom, until Michael had red marks on his behind and could not sit down." Michael confirmed that his father kicked him and showed Turner a circular scar on his back, which he said was from father burning him on the back with a cigarette. Michael said "he did not know whether his dad did this on purpose or not." Turner observed that the burn scar "appeared to be from straight on contact and not a glancing burn from a child accidentally brushing against a parent's cigarette." Father argues that Turner retracted his opinion that the burn was intentional when testifying at the jurisdictional hearing. The referenced testimony is ambiguous but does not constitute a retraction. Turner testified, concerning the burn mark, "[t]his was a small circular mark right directly between the shoulder blades, and have I seen cigarette burns like that, scars, old ones that have healed? I have. If it's an accidental cigarette burn which I've also seen where a small child runs across a parent holding one it's more of a straight pin-like circle. And that's

9

what he had on him." Father interprets Turner as saying Michael had a burn mark consistent with a glancing, accidental burn, and not a circular mark consistent with direct contact as Turner described the scar in his report. Father's reading of the testimony is not supported when the record is read as a whole. In testimony following the ambiguous remarks, Turner said the burn was "a very circular mark" and accidental burnings "tend to be a scraping or a brushing burn." The testimony, read as a whole, indicates that Turner's report and testimony are consistent in opining that Michael was intentionally burned. Moreover, the finding of physical abuse was not founded on this incident alone and thus any ambiguity in Turner's testimony does not undermine the court's jurisdictional finding.

## Disposition

The jurisdictional and dispositional orders are affirmed.


_____

Pollak, Acting P. J.


We concur:


_____

Siggins, J.


_____

Jenkins, J.